UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------X
JAMES ANDERSON CAMPBELL, JR.,

                    Petitioner,

                                        MEMORANDUM AND ORDER
          -against-                     06-CR-00264(2) (JS)   FILED
                                                             CLERK

UNITED STATES OF AMERICA,
                                        2:29 pm, Aug 16, 2021
                    Respondent.
------------------------------------X                        U.S. DISTRICT COURT
                                                             EASTERN DISTRICT OF NEW YORK
APPEARANCES                                                  LONG ISLAND OFFICE
For Petitioner:      James Anderson Campbell, Jr., pro se
                     #71743-053
                     Federal Prison Camp-Duluth
                     P.O. Box 1000
                     Duluth, Minnesota 55814

For Respondent:      Christopher C. Caffarone, Esq.
                     United States Attorney's Office
                     Eastern District of New York
                     610 Federal Plaza
                     Central Islip, New York 11722

SEYBERT, District Judge:

          Before the Court is the motion of James Anderson

Campbell, Jr., ("Petitioner") seeking, pursuant to 28 U.S.C. §

2255, to vacate or, in the alternative, correct his sentence

(hereafter, the "Motion"). (See Motion, ECF No. 312; see also

Reply, ECF No. 323.[1])  The Government objects. (See Opp'n, ECF

No. 318.)  For the following reasons, the Motion is DENIED.

---

[1]  Herein, the Court cites to the internal pagination of these
documents.

1

BACKGROUND

On April 19, 2006, a one-count indictment was returned charging Petitioner with conspiracy to commit mail and wire fraud, in violation of 18 U.S.C. § 1349.  The charge arose out of a fraudulent scheme (hereafter, the "Scheme") led by John Juncal, in which Petitioner, Rodney Sampson, and Emerson Corsey joined (hereafter, Juncal, Sampson, and Corsey are referred to collectively as the "Codefendants" or "Coconspirators", and together with Petitioner, the "Group").  To facilitate the Scheme, the Group conspired to convince a Long Island hedge fund company (hereafter, the "Company") to loan them $3 billion (hereafter, the "Loan") purportedly to build an oil pipeline in the Republic of Buryatia.  In doing so, the Group claimed that Juncal was a United States diplomat tasked with carrying out that venture, and that they owned $5 billion of United States Treasury securities (hereafter, the "Securities"), which were physically located at a bank in Austria for safekeeping.  As collateral for the Loan, the Group pledged those Securities, which the evidence introduced at trial overwhelmingly established they did not actually own or possess.  Unbeknownst to the Group, the Company was actually working with the Federal Bureau of Investigation (the "FBI") through a cooperating witness (hereafter, the "Cooperating Witness") who was operating at the FBI's direction.  (See Aff. & Compl., Supp. Of Arrest Warrant Appl., ECF No. 1, ¶; see also Opp'n

at 1.)  Through the Cooperating Witness, the FBI was able to record hours' worth of conversations among Petitioner, his Codefendants, and the Cooperating Witness.  On March 23, 2006, as he was on his way to meet the Cooperating Witness for the would-be closing of the Loan, Petitioner was arrested.  (See Ex. 2, ECF No. 318-2, at 2, attached to Opp'n.)  In a post-arrest statement given after waiving his Miranda rights, Petitioner admitted that "[he] knew" the purported Loan closing "wasn't for real when [he] came to [New York]."  (Id. at 3.)

Following a jury trial, Petitioner and his Codefendants were convicted of the sole count in the indictment, i.e., attempted and conspiracy to commit mail fraud.  (See Verdict.)  Thereafter, on March 18, 2010, Petitioner was sentenced to 240 months in prison for his part in the Scheme.[2]  (See Verdict, ECF No. 117-3; see also Aff. & Compl., Supp. Of Arrest Warrant Appl., ECF No. 1, at 1-4; J., ECF No. 179.)

In the context of this Motion, the parties dispute whether the Securities, as presented to the Cooperating Witness,

---

[2]  Petitioner appealed his January 2009 conviction and March 2010 sentence to the Second Circuit.  (See Notice of Appeal, ECF No. 181.)  The Circuit Court affirmed the conviction, but remanded the case for resentencing.  See United States v. Corsey, 723 F.3d 366 (2d Cir. 2013).  Upon resentencing, Petitioner's term of imprisonment was reduced from the original twenty years to sixteen years.  (See Am. J, ECF No. 301.)  Upon further appeal, Petitioner's resentencing was affirmed.  See United States v. Sampson, No. 14-3357-cr(L), Mandate (2d Cir. May 5, 2016) (docketed in Case No. 06-CR-0264 at ECF No. 310).

were authentic and legitimate.  The Government contends that, as successfully proved at trial, the CUSIP[3] numbers assigned to the Securities were in fact authentic but that neither Petitioner nor his Codefendants owned those Securities.  (See Opp'n at 6 ("[A] search of the Treasury Department's database, which listed the names of the owners of those registered securities[, i.e., the Securities], revealed that [Petitioner] and his [C]odefendants and any related entities did not own those securities.").)  Therefore, the claim of Petitioner and his Codefendants that they owned the proffered collateral was a lie.  (See id.)  Yet, Petitioner maintains that he is innocent of the crime of which he was convicted and argues that he "only vouched for legitimate

---

[3]        CUSIP refers to the Committee on Uniform Securities Identification Procedures which oversees the entire CUSIP system.  The CUSIP number is a unique identification number assigned to all stocks and registered bonds in the United States and Canada, and it is used to create a concrete distinction between securities that are traded on public markets. These numbers are used to help facilitate trades and settlements by providing a constant identifier to help distinguish the securities within a trade. Each trade and the corresponding CUSIP number are recorded to facilitate the tracking of actions and activities.

James Hayes, Laws & Regulations: CUSIP Number (updated May 13, 2021), https://www.investopedia.com/terms/c/cusipnumber.asp (hyperlink removed).  "[A] CUSIP number is a unique identifier attached to the securities issued by a company, whether stocks or bonds."  Id. (emphasis added; hyperlink removed).

[Securities]" and, thus, should not be held accountable for the Scheme to defraud the Company.  (Reply at 3.)  In particular, Petitioner argues that: (1) he was denied his Sixth Amendment right to effective assistance of counsel because his attorney, Richard A. Miller ("Miller"), failed to argue for a correct valuation of losses at sentencing, which could have helped him secure a minor role reduction in sentencing; (2) the Government failed to produce documents that Petitioner alleges would have exonerated him; and (3) he is innocent of the offense of which he was convicted.

DISCUSSION

I.    THE APPLICABLE LAW

Section 2255(a) of Title 28 of the United States Code provides:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255(a).  Habeas relief pursuant to § 2255 lies where there is "a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes a fundamental defect which inherently results in a complete

5

miscarriage of justice." Cuoco v. United States, 208 F.3d 27, 30 (2d Cir. 2000) (internal quotation marks and citations omitted). A petitioner must also show that the error had "substantial and injurious effect" that caused "actual prejudice." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (internal quotation marks and citations omitted); Underwood v. United States, 166 F.3d 84, 87 (2d Cir. 1999) (applying Brecht to a § 2255 motion). To "obtain collateral relief a prisoner must clear a significantly higher hurdle than would exist on direct appeal." United States v. Frady, 456 U.S. 152-53, 166 (1982). A court must exercise its discretion sparingly because § 2255 applications "are in tension with society's strong interest in the finality of criminal convictions." Elize v. United States, No. 02-CV-1530, 2008 WL 4425286, at *5 (E.D.N.Y. Sept. 30, 2008) (internal quotation marks and citation omitted); see also Brecht, 507 U.S. at 633–34.

     To prevail on an ineffective assistance claim, a petitioner must establish: (1) that "counsel's representation fell below an objective standard of reasonableness . . . under prevailing norms;" and (2) having suffered prejudice as a result of defense counsel's deficient performance. Strickland v. Washington, 466 U.S. 668, 692 (1984). Under the first prong, the court must "eliminate the distorting effects of hindsight," "evaluate the conduct from counsel's perspective at the time," and "indulge a strong presumption that counsel's conduct falls within

6

the wide range of reasonable professional assistance." Id. at 689. To establish prejudice, a petitioner must show that "there is a reasonable probability that, but for counsel's errors, the outcome of the proceeding would have been different." Id. at 694. "A reasonable probability is one sufficient to undermine confidence in the outcome of the trial or appeal." Dunham v. Travis, 313 F.3d 724, 730 (2d Cir. 2002) (citing Strickland, 466 U.S. at 694). "[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the [petitioner] makes an insufficient showing on one" of the Strickland prongs. Strickland, 466 U.S. at 697. "The Strickland standard is rigorous, and the great majority of habeas petitions that allege constitutionally ineffective counsel founder on that standard." Lindstadt v. Keane, 239 F.3d 191, 199 (2d Cir. 2001).

II. ANALYSIS

1. The ineffective assistance claim

Petitioner asserts that Miller failed to provide effective counsel in two ways: (1) failing to obtain certain business records from the Government before trial (hereafter, the "Treasury Documents") that would have bolstered Petitioner's position concerning the authenticity of the Securities, and (2) failing to properly investigate and argue for a lower loss amount,

thereby foreclosing Petitioner's ability to receive a minor role reduction during sentencing.

As to the claim regarding the Securities: Petitioner contends that Miller was

> furnished with various evidentiary artifacts from the Law Firm of Spankos & Spankos ("Spankos"), that included: **(1)** a Euroclear Bank Securities validation of the [Securities] Juncal sought to use as collateral for his loan [. . .]; and **(2)** additional corporate documentation that establishes Juncal's ownership and legal access to the proposed [Securities] as a viable asset for him to use as collateral in any business transaction of his choosing.

(Reply at 6 (emphasis in original).)  According to Petitioner, the Treasury Documents establish his innocence and should have been presented to the jury.  Petitioner argues that Miller's failure to move to compel disclosure of the Treasury Documents during trial denied him effective assistance of counsel.  The record, however, does not support such an argument.[4]

Under Strickland, counsel does not have a duty to advance every nonfrivolous argument and is permitted to make a strategic decision to advance only those claims having the greatest merit. See Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994).  Miller's

---

[4]  The record does not make clear whether Miller possessed the Treasury Documents before Petitioner's trial.  However, it appears that the Government made the Treasury Documents available to Miller as part of open discovery.  (See Opp'n at 8; see also Ex. 1, ECF No. 318-1, attached to Opp'n.)  Regardless, the Court's analysis does not change.

election not to present the Treasury Documents as part of Petitioner's case in chief does not amount to ineffective assistance since those Documents do not (1) establish, as Petitioner suggests, Juncal's "ownership and legal access to the [. . . Securities] as a viable asset for him to use as collateral in any business transaction of his choosing[,]" or (2) identify Petitioner or any of his Codefendants as owners of the Securities. (Reply at 6; <u>see also</u> Ex. A, ECF No. 323 at pp. 14-21, at 1-3, <u>attached to</u> Reply.)  Rather, the Treasury Documents identify an entity, "Red Rock Dragon," which Petitioner claims, without support, was owned or controlled by Juncal, one of his Codefendants. That, simply, is not enough. Other that identifying the Securities at issue and their entity owner, the Treasury Documents offer little to no evidentiary value. Indeed, as the Government astutely argues, Petitioner "fails to identify how these documents would have been helpful to his defense." (Opp'n at 6.) Upon the record presented, given the lack of probative value the Treasury Documents would add, Miller's decision to not rely upon them did not prejudice Petitioner. Hence, Petitioner fails to make out a cause of ineffective assistance of counsel in this regard.

As to the failure-to-investigate/minor role claim: First, Petitioner contends that he was to receive only $2 million at the close of the Loan, thereby evidencing his negligible role

compared to his Codefendants.  (See Reply at 4.)  He argues he "was not aware, nor does the evidence establish his intent was to defraud billions, but instead only an amount equal to that of his payment for handling Juncal's finances," i.e., $2 million.  (Id. (further claiming Petitioner's "role was only limited to the verification of Juncal's T-notes for a business transaction unknown").)  However, this is inconsistent with Petitioner's post-arrest admission that "he expected to keep some $11 million if the [L]oan was issued[.]"  (Ex. 2 at 3.)  More important, the trial evidence overwhelmingly established that Petitioner: conspired with his Codefendants; knew that he and the Codefendants were seeking to obtain the Loan from the Company and that the Loan was supposedly to be secured by the Securities, which Petitioner further knew neither he nor his Codefendants possessed; believed he and his Codefendants had successfully hoodwinked the Company into lending the Group $3 billion since he traveled to New York to attend the closing for that Loan; and, knew the proposed deal was not legitimate.  Thus, even if Petitioner expected only a relatively small portion of the Loan's proceeds, given his degree of involvement, it was reasonably foreseeable to Petitioner that a $3 billion loss would occur.  Hence, as a coconspirator of the Scheme, Petitioner was culpable for the entirety of the scheme.

As stated by the Government in opposition:[5] "It is axiomatic that when a defendant is convicted for a jointly undertaken criminal activity, he is responsible for all reasonably foreseeable acts of others in furtherance of the conspiracy." (Opp'n at 3 (citing United States v. Sanchez, 455 F. App'x 27, 31 (2d Cir. 2006); further citation omitted).) Thus, for Miller to advance a counter position – the one Petitioner advances here – would have been frivolous; rather, given the law and the facts of this case, Petitioner fails to overcome the strong presumption that Miller's conduct fell within the wide range of reasonable professional assistance.

Second, regarding Petitioner's sentencing portion of his argument, his understanding of how losses are calculated and how

---

[5]  The Government also argues:

> [Petitioner]'s claim regarding his attorney's failure to raise this argument at trial is baseless because such an argument would have been irrelevant as the amount of loss, or intended loss, was not an element of the offense. Put another way, the [G]overnment was not required to prove at trial that [Petitioner] and his coconspirators intended to cause the [Company] to lose any money, let alone that they actually caused a loss. Obviously, [Petitioner]'s attorney, an experienced and skilled federal criminal defense attorney, cannot be found to be ineffective for failing to posit an argument that was irrelevant and inconsistent with the law.

(Opp'n at 3.)  The Court agrees.

losses impact a minor participant offense level adjustment is at odds with the law. "[A] minor participant offense level adjustment is a distinct issue from an adjustment based on the amount of loss." Tyagi v. United States, No. 06-CR-0198, 2010 WL 1050292, at *2 (S.D.N.Y. Mar. 19, 2010). "[T]he proper loss amount attributable to Petitioner is the amount that was reasonably foreseeable to him[.]" Id. Here, as discussed supra, it was reasonably foreseeable that the total loss from the Scheme would be $3 billion, as that was the total amount of the Loan Petitioner and his Codefendants sought to secure from the Company. Petitioner's intent to profit by only $2 million from the Scheme is of no moment. Rather, given that the law holds a defendant accountable for all reasonably foreseeable acts of his coconspirators in furtherance of the conspiracy, and as discussed supra, given that Petitioner could reasonably foresee the Scheme was intended to result in a $3 billion loss, arguments to the contrary at sentencing would have been futile. Thus, instead of making such a frivolous argument at sentencing, Miller "astutely and expertly focused on arguing that other Guidelines enhancements should not apply and appropriately made a lengthy plea for leniency arguing that the Guidelines overrepresented the seriousness of the offense." (Opp'n at 4.) This is far from deficient counseled assistance warranting habeas relief; it is representation that fell well within the wide range of professionally competent

12

assistance to which Petitioner was entitled and received. Therefore, Petitioner cannot sustain his ineffective assistance claim on this argument.

## 2.   The *Brady* violation claim

Petitioner alleges that the Government engaged in misconduct by failing to provide Petitioner with the Treasury Documents, thereby violating Brady v. Maryland, 373 U.S. 83, 86 (1963).  The Court disagrees.

"The Government violates a defendant's due process rights when it fails to disclose favorable material evidence to a criminal defendant." United States v. Thomas, 981 F. Supp. 2d 229, 238 (S.D.N.Y. 2013); see also Brady, 373 U.S. at 86.  To successfully establish a Brady violation, one must prove that: "(1) the Government, either willfully or inadvertently, suppressed evidence; (2) the evidence at issue is favorable to the defendant; and (3) the failure to disclose this evidence resulted in prejudice." United States v. Coppa, 267 F.3d 132, 140 (2d Cir. 2001).  Evidence is suppressed when the prosecutor does not disclose it "in time for its effective use at trial." Id.

Petitioner fails to establish that the Government either willfully or inadvertently suppressed the Treasury Documents. Rather, the record evidence demonstrates that, notwithstanding the Government's rejection of the characterization of the Treasury Documents as exculpatory pursuant to Brady, "[t]he materials

13

[we]re nonetheless provided." (Government's Feb. 22, 2007 Letter, ECF No. 33, <u>attached as</u> Ex. 1 to Opp'n ("Pursuant to your request regarding so-called 'exculpatory' material forwarded to this Office by the law firm Spanakos & Spanakos, Esqs., on behalf of your client, please find enclosed copies of said documents.").) Notably, while the Government's February 22, 2007 letter was docketed without the indicated enclosures, it was sent to all defendants' counsel, thereby putting Petitioner and his Codefendants on notice of the Treasury Documents Petitioner now claims were suppressed.[6]

---

[6] The Court further notes that long before trial, the Government sent recordings and documents regarding the Scheme to defendants. (<u>See, e.g.</u>, Government's Oct. 11, 2006 FED. R. CRIM. P. 16 Letter, ECF No. 33.) The Government also provided Petitioner and his Codefendants access to open-file discovery allowing each Defendant to visit the FBI office for a discovery session "where they were afforded an opportunity to review all documents obtained in this case, and were provided with copies of any items that they requested." (Government's July 26, 2007 Response Letter, ECF No. 41, at 8, <u>attached as</u> Ex. 2 to Opp'n.) "Counsel were [further] advised that they could return at a later date should they wish [to] review these materials again." (<u>Id.</u>)

Courts have routinely found that open file discovery can satisfy <u>Brady</u> requirements so long as the Government does more than allow access to a voluminous file. <u>See, e.g.</u>, <u>United States v. Skilling</u>, 554 F.3d 529, 577 (5th Cir. 2009), <u>aff'd in part and vacated in part on other grounds</u>, 561 U.S. 358 (2010) (finding that <u>Brady</u> violations related to voluminous open file discovery depend on "what the government does in addition to allowing access to a voluminous open file"); <u>see also</u> <u>United States v. Thomas</u>, 981 F. Supp. 2d 229, 239 (S.D.N.Y. 2013) ("[T]he Government cannot hide <u>Brady</u> material as an exculpatory needle in a haystack of discovery materials." (citations omitted)); <u>United States v. Hsia</u>, 24 F. Supp. 2d 14, 29-30 (D.D.C. 1998) ("The Government cannot meet its <u>Brady</u> obligations by providing . . . 600,000 documents and then

Even if, _arguendo_, the Government had inadvertently suppressed evidence, Petitioner's _Brady_ violation claim would still fail since he cannot satisfy the remaining two prongs of the applicable analysis, _i.e._, such evidence would have been favorable to him, and failure to disclose that evidence caused prejudice to him. As addressed, _supra_, the Treasury Documents would not have advanced Petitioner's defense theory since they could not establish a nexus between the Securities and the Group. Rather, at most, they identified certain securities held by an entity not shown to have any connection with Petitioner or his Codefendants. In sum, Petitioner cannot maintain his _Brady_ violation claim.

### 3. The actual innocence claim

Petitioner further argues that the Treasury Documents "establish[] in fact and law that no reasonable juror could have found [him] guilty of any conspiracy of fraud . . . ." (Reply at 8 (citing Ex. A).) His claim of actual innocence is unavailing.

> The Court of Appeals has indicated that the standard for making a claim of actual innocence is not a low bar:
>
>> [The claim must] be both "credible" and "compelling." To be "credible," the claim must be supported by "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." For the

claiming that [the defendant] should have been able to find the exculpatory information[.]").

15

> claim to be "compelling," the
> petitioner must demonstrate that
> "more likely than not, in light of
> the new evidence, no reasonable
> juror would find him guilty beyond
> a reasonable doubt—or to remove the
> double negative, that more likely
> than not any reasonable juror would
> have reasonable doubt."

Johnson v. Capra, No. 16-CV-3116, 2018 WL 1581682, at *6 (S.D.N.Y. Mar. 27, 2018) (quoting Rivas v. Fischer, 687 F.3d 514, 541 (2d Cir. 2012); further citation omitted); see also Danielson v. Lee, 715 F. App'x 45, 48–49 (2d Cir. 2017) ("To succeed on an actual innocence claim, a petitioner must 'support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." (quoting Schlup v. Delo, 513 U.S. 298, 324 (1995)).

Petitioner contends that the Treasury Documents include facts from which "any reasonable juror could conclude . . . that the proposed [Treasury Securities] were valid and under the control of Juncal, and [Petitioner]'s attestment to these facts . . . was not a crime." (Reply at 8.) The Court disagrees. Even assuming, arguendo, that Petitioner could meet the credible prong of the actual innocence analysis by relying upon the Treasury Documents as new reliable evidence, he is unable to meet the compelling prong of the analysis since it is not more likely that, with the introduction of the treasury Documents, any reasonable juror would

16

have reasonable doubt as to his guilt.  As explained supra, the Treasury Documents would have had little probative value as they fail to establish the Treasury Securities were owned by Juncal or were available to him for use as collateral to secure the Loan. Moreover, having reviewed the record, the Court agrees with the Government that "the evidence adduced at trial was overwhelming" that Petitioner and his Codefendants conspired to commit mail and wire fraud.  By way of example, the Government: played recorded telephone conversations between Petitioner and the Cooperating Witness; introduced telephone records showing regular calls between Juncal, the Scheme's originator, and Petitioner; and, elicited Petitioner's post-arrest confession whereby he admitted knowing the Loan deal was not legitimate.  (See Opp'n at 6-7.) Thus, Petitioner's actual innocence claim cannot stand.

### 4.  An evidentiary hearing is not warranted

Section 2255 provides that a court shall hold an evidentiary hearing "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief."  28 U.S.C.A. § 2255(b).  Moreover, "[w]hen there are no material facts in dispute or a petitioner makes only vague or conclusory allegations, the Court may base its decision on the parties' written submissions." Seabrook v. United States, No. 16-CV1-676, 2020 WL 5764370, at *6 (S.D.N.Y. Sept. 27, 2020) (quoting

17

Gonzalez v. United States, 722 F.3d 118, 130-31 (2d Cir. 2013));

see also Lang v. United States, No. 02-CR-1444, 2009 WL 4788430,

*2 (S.D.N.Y. Dec. 9, 2009) (citing and quoting Chang v. United

States, 250 F.3d 79, 86 (2d Cir. 2001)).  Having considered the

lack of record support for any of Petitioner's claims, coupled

with Petitioner's conclusory allegations, which, taken together,

conclusively show that Petitioner is not entitled to any habeas

relief, the Court finds no evidentiary hearing on this Motion is

warranted and denies Petitioner's hearing request.

★★★

To the extent not articulated, the Court has considered

Petitioner's remaining arguments and finds them to be without

merit.

CONCLUSION

Accordingly, for the reasons stated herein, IT IS HEREBY

ORDERED that Petitioner's Motion (ECF No. 312) is DENIED.

IT IS FURTHER ORDERED that the Court: (1) declines to

issue a certificate of appealability because Petitioner has not

made a substantial showing that he was denied a constitutional

right, see 28 U.S.C. § 2253(c)(2); and, (2) certifies that any

appeal of this Order would not be taken in good faith, and thus

his in forma pauperis status is denied for the purposes of any

appeal.  See Coppedge v. United States, 369 U.S. 438, 444-45

(1962).

       IT IS FURTHER ORDERED that the Clerk of the Court: (1) mark CLOSED the corresponding civil case, Case No. 17-CV-0638; and (2) mail a copy of this Order to the <u>pro se</u> litigant at his address of record.

**SO ORDERED.**

                         /s/ JOANNA SEYBERT
                        Joanna Seybert, U.S.D.J.

Dated:  August _16_, 2021
       Central Islip, New York